IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| ORBITAL ENGINEERING, INC., | ) |
| | ) Civil Action No. 2:22-cv-00185 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **Jury Trial Demanded** |
| DVG TEAM, INC.; and | ) |
| ZACHARY TOPOLL, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Orbital Engineering, Inc. ("Orbital" or the "Company") files this Complaint against DVG Team, Inc. ("DVG") and Zachary Topoll ("Topoll" and, together with DVG, the "Defendants").

## INTRODUCTION

1. Zachary Topoll was employed by Orbital as the Company's Department Manager for Utility Infrastructure Improvement.

2. When he announced his intention to resign in April, 2022, Topoll was in the midst of managing a significant utility infrastructure project for one of Orbital's most significant customers, Northern Indiana Public Service Company ("NIPSCO").

3. Unbeknownst to Orbital, Topoll intended to join a competitor, DVG Team, Inc. Making matters far worse, Topoll deliberately exploited his position of trust and confidence as well as his knowledge of the Company's proprietary information and goodwill to interfere in Orbital's relationship with NIPSCO by diverting to DVG services that Orbital had previously agreed to provide for NIPSCO. Because Topoll misled Orbital about his intentions, he continued to access Orbital's confidential and proprietary information relating to the Company's work for

NIPSCO through the last day of his employment, thereby enabling himself to exploit that information in real time on DVG's behalf.  DVG actively assisted Topoll.

4. Through their improper conduct, Topoll and DVG have diverted to themselves revenues totaling hundreds of thousands of dollars for work that NIPSCO had previously issued to Orbital.

5. In this action, Orbital seeks monetary relief to compensate the Company for all lost profits and other damages sustained by the Company as a result of the Defendants' improper conduct.

## THE PARTIES

6. Orbital is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal place of business at 1344 Fifth Avenue, Pittsburgh, Pennsylvania 15219.

7. Upon information and belief, DVG is a corporation organized under the laws of Indiana.  DVG has a place of business at 1155 Troutwine Road, Crown Point, Indiana 46307.

8. Topoll is an individual who, upon information and belief, resides at 9122 Mallard Lane, Saint John, Indiana 46373.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 because it involves claims that arise under the laws of the United States and otherwise involves claims that are so related to those claims that they form part of the same case or controversy under Article III of the United States Constitution.

10. This Court also has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy, exclusive of interests and costs, exceeds $75,000.

11. Defendants are subject to the personal jurisdiction of this Court because DVG does business in this District and Topoll has conducted activities in, maintained sufficient contacts with, and has otherwise caused harm in the forum in a manner sufficient to place him within the personal jurisdiction of this Court. Moreover, a portion of the events giving rise to this action occurred in this District.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District, a portion of the events and omissions giving rise to the claims occurred in this District, and Defendants are otherwise subject to the Court's jurisdiction in this District.

## FACTUAL BACKGROUND

### A. Orbital's Business and Protectable Interests

13. Orbital provides full-service solutions in engineering and design, construction management, QA/QC, safety, and asset integrity services. Founded in 1969, the Company employs more than 500 engineering and support staff members in its offices across the country.

14. The Company services a broad range of industries, including infrastructure, metals, refinery, chemical, pipeline, terminal, gas processing and storage, and utilities.

15. The Company employs highly trained individuals who are focused on providing the Company's customers with an unparalleled service experience.

16. The industry in which Orbital operates is highly competitive.

17. Orbital devotes significant resources, time, and money to maintain its competitive position in the marketplace.

18. Orbital devotes significant resources to train its employees to ensure that they acquire and maintain the knowledge and skills necessary to provide effective sales and service support to the Company's customers.

19. Orbital also has devoted significant time and money to develop long-term customer relationships and goodwill. Those relationships are built on trust and personal interactions with decision makers and could not easily be replicated without a substantial investment of time, effort and money.

20. Orbital's customer-facing employees develop close personal relationships with the Company's customers.

21. In carrying out its business activities, Orbital relies on a broad range of confidential, proprietary, and trade secret business information that is the product of Orbital's substantial expenditure of time, expertise, and experience. That information includes, without limitation, information necessary to prepare bids; to develop pricing and pricing models; to determine and manage costs and margins; to formulate and pursue prospective business opportunities; to assess and satisfy customers' needs, requirements and preferences; to develop and implement service delivery methodologies and techniques; and to formulate and deploy effective business development strategies.

22. Orbital's confidential information derives its value from remaining confidential.

23. Orbital takes reasonable efforts to maintain and safeguard the confidentiality of its confidential, proprietary information, and trade secret information. Those measures include limiting access to Orbital's confidential information to a "need to know" basis, utilizing employee-specific passwords, and requiring that employees (such as Topoll) acknowledge their

4

understanding of and their agreement with the confidentiality provisions in the Orbital employee handbook, which forbid the disclosure and misuse of the Company's confidential information.

B.   **Orbital's Business Relationship with NIPSCO**

24. NIPSCO is the largest natural gas distribution company and the second largest electric distribution company in the state of Indiana.

25. NIPSCO is a long-standing Orbital customer, and the parties have enjoyed a successful, stable business relationship for many years.

26. Orbital performs a broad range of electrical utility related projects (among others) for NIPSCO. The Company's work for NIPSCO includes public improvement electric projects, distribution design projects, joint-use attachment design and loading analyses, drone projects and various gas-related projects.

27. Orbital also performs extensive design and construction services for NIPSCO relating to its utility infrastructure, including fielding, designing and providing construction packages for recloser devices, commonly referred to as "Vipers."

28. Given the quality of Orbital's work as well as its extensive experience in working with NIPSCO's utility infrastructure, Orbital is one of NIPSCO's preferred vendors.

29. Orbital has devoted significant resources and time to develop and to maintain its business relationship with NIPSCO, which is built on a long track record of tailored service and successful results.

C.   **DVG**

30. DVG purports to be a company with expertise in the areas of public infrastructure planning and construction, private and public utility development, engineering and site design, economic development, and real estate development.

5

31. DVG is one of Orbital's competitors.

32. Orbital has previously retained DVG as one of its subcontractors to perform certain survey and mapping work for NIPSCO-related projects.

**D.    Topoll's Employment with Orbital**

33. Topoll was an Orbital employee from 2009 until April 2022.

34. In connection with his employment, Orbital provided Topoll with an employee handbook, which requires Topoll to safeguard the Company's confidential information during and after his employment.

35. Topoll signed an acknowledgement certifying that he read and understood the policies and obligations in the Employee Handbook.

36. At the time of his sudden resignation, Topoll was a Department Manager at Orbital. In that role, Topoll oversaw a team exclusively responsible for gas-related, electric utility, and infrastructure work for NIPSCO.

37. As part of his role with Orbital, Topoll was exposed to and developed an intimate working knowledge of various information, methodologies and strategies utilized by the Company in its utilities infrastructure practice as a whole as well as in its work for NIPSCO in particular.

38. Topoll had access to a broad range of Orbital's confidential, proprietary and trade secret information relating to the Company's work for NIPSCO, including, without limitation, the following:

   a. Orbital's models and methodology used in calculating project pricing and costs, including the various inputs that make up that calculation;

   b. Orbital's information and tools utilized to develop cost estimation for project tasks specifically for electric utility distribution and transmission design and construction;

6

      c. Orbital's information and methodology used in preparing joint use per pole pricing calculations, including time studies and budget monitoring;

      d. Orbital's agreed billing rates by role, which Orbital negotiated with NIPSCO; and

      e. Orbital's automation software, which was created to develop, test, and launch technology driven solutions to automate project deliverables for NIPSCO.

39. Topoll was responsible for every aspect of the Company's work for NIPSCO. He developed work proposals and provided them to NIPSCO; he received and addressed work-related concerns; he forecasted the Company's staffing needs and anticipated costs; and he hired necessary employees to ensure that work for NIPSCO was completed in a timely, effective and efficient manner.

40. In a similar vein, Topoll knew and understood the Company's pricing and work-flow models for NIPSCO as well as the Company's constraints and tolerances.

41. Topoll was the Company's "face" with respect to Orbital's work that he oversaw for NIPSCO, and he served as one of the Company's principal contacts with NIPSCO with respect to that work.

42. As a result of his work with Orbital, Topoll knew *everything* about Orbital's work for NIPSCO, and he knew how to replicate those services, start-to-finish, on behalf of a competitor.

43. On April 18, 2022, Topoll unexpectedly resigned from his position. Despite pointed questions from the Company's leadership, Topoll did not reveal his intention to join a competitor. Topoll's last day at Orbital was April 29, 2022, and he continued to maintain access to the Company's confidential and proprietary information through that date.

**E.    Topoll's Work on the Valparaiso Viper Project**

7

44. In December, 2021, Topoll began formulating plans for the Company's Viper-related work for NIPSCO for calendar years 2022 and 2023, the same way as he had done in years past.

45. As part of that plan, Orbital was scheduled to install 60 Vipers in and around Valparaiso, Indiana, for NIPSCO (the "Valparaiso Viper Project").

46. That project was a continuation of the Company's work for NIPSCO in 2021, and Topoll explained to management his plans to use the then-existing Orbital team for the 2022 work, whose involvement he had already calculated and forecasted in 2021.

47. Throughout winter and early spring 2022, Topoll continued to communicate with key decision makers at NIPSCO to discuss the details of the Valparaiso Viper Project and to submit all of the necessary paperwork and change orders to complete the work.

48. On April 13, 2022—mere days before announcing his resignation—Topoll informed NIPSCO that he had completed a draft proposed change order for the Valparaiso Viper Project but was awaiting confirmation concerning the exact locations of the Vipers.

49. After Topoll announced his intention to resign, Orbital's leadership asked Topoll to help transition his responsibilities to and train his replacement at the Company so as to ensure that NIPSCO did not experience any interruptions or delays resulting from Topoll's resignation. Topoll agreed, and Orbital continued to involve and copy Topoll on confidential internal communications concerning Valparaiso Viper Project as well as other work for NIPSCO.

50. Had Topoll disclosed his intention to join a competitor, Orbital would have immediately shut off his access to the Company's internal information and terminated his involvement with NIPSCO-related work.

51. On or about April 28, 2022 (i.e., Topoll's penultimate day with Orbital), NIPSCO sent to Orbital the locations for the Vipers to be installed under the Valparaiso Viper Project. Topoll was copied on that communication.

52. On April 29, 2022 (i.e., Topoll's last day with Orbital), NIPSCO provided an estimated timeline for Orbital to complete its work under the Valparaiso Viper Project. Topoll was copied on that communication as well.

53. When Topoll left Orbital on April 29, 2022, he knew exactly what services Orbital would be providing to NIPSCO under the Valparaiso Viper Project (among others), where those services would be provided, and when.

54. Orbital had a reasonable expectation that it would complete the work under the Valparaiso Viper Project, consistent with NIPSCO's projects on prior occasions.

### F. DVG's and Topoll's Interference with Orbital's Relationship with NIPSCO

55. Several weeks after his resignation, Orbital learned for the first time that Topoll had accepted a role with DVG as its Director of Utility Engineering.

56. Upon information and belief, Topoll had accepted an employment offer before he ceased his employment with Orbital and, as a result, continued to access and review Orbital's confidential and proprietary information concerning the Valparaiso Viper Project knowing that he would be pursuing that very same work on DVG's behalf.

57. Upon information and belief, DVG solicited Topoll in an effort to persuade him to resign from his employment with Orbital and to join DVG instead. Upon information and belief, DVG knew the nature of Topoll's role and responsibilities for Orbital, and DVG sought to hire Topoll to compete with Orbital with respect to the Company's work for NIPSCO. Upon information and belief, DVG has solicited other Orbital employees in the same manner.

9

58. Upon information and belief, prior to hiring Topoll, DVG did not provide the Viper-related services that Orbital provides for NIPSCO and did not have the knowledge or expertise to do so.

59. Before hiring Topoll, DVG did not market itself as a provider of "Utility Engineering" services in the electric or gas fields – i.e., the exact work that Topoll performed for Orbital.  DVG has begun to market those services after hiring Topoll.

60. Upon information and belief, DVG and Topoll launched a utilities infrastructure practice by using and relying upon the confidential and proprietary information that Topoll learned and had access to during his employment with Orbital.

61. After DVG hired Topoll, Defendants targeted the Valparaiso Viper Project by exploiting Orbital's confidential, proprietary, and trade secret information, including, without limitation, Orbital's proprietary methods and tools for estimating project costs and completing cost estimation, Orbital's joint use per pole pricing calculations developed through time studies, and Orbital's agreed billing rates by role specifically negotiated with NIPSCO.

62. Upon information and belief, Defendants used Topoll's knowledge of Orbital's confidential and proprietary information relating to NIPSCO and Valparaiso Viper Project to approach NIPSCO and to divert a portion of the work that was previously issued by NIPSCO to Orbital.  DVG and Topoll exploited Orbital's confidential and proprietary information to jump-start a practice that would have taken a significant investment of time and resources to develop.

63. Among other such information, Topoll knew and understood the status of Orbital's schedule for completing the work under the Valparaiso Viper Project, and, upon information and belief, Topoll proposed to complete a portion of the work that had been awarded to Orbital on an expedited basis.  In so doing, Topoll knew Orbital's pricing and cost structures

relating to the work, and he knew the man-power and other resources needed to complete the work. Upon information and belief, Topoll exploited that information to present a proposal intended to undercut Orbital. But for Topoll's role with Orbital, Topoll would not have known any of the information necessary to divert the work at issue.

64. Upon information and belief, DVG knew about and actively assisted Topoll in those efforts.

65. Topoll's efforts worked exactly as planned. Shortly after Topoll joined DVG, Orbital was shocked to learn that NIPSCO was moving from Orbital to DVG 40% of the work previously awarded by NIPSCO to Orbital on the Valparaiso Viper Project, causing Orbital to suffer hundreds of thousands of dollars in damages as a result.

66. Topoll was personally responsible for and intimately involved with developing, quoting and executing upon the Company's work for NIPSCO with respect to the Valparaiso Viper Project, he concealed his intentions to join a competitor so as to continue receiving that information through the date of his termination, and he exploited his knowledge of that information and the Company's goodwill to divert that business to his new employer.

67. Defendants' interference with Orbital's business relations with NIPSCO has caused Orbital monetary and reputational harm.

**COUNT I**
**Breach of Fiduciary Duty**
**Damages Resulting from Conspiracy**
**(Orbital v. All Defendants)**

68. Orbital hereby incorporates by reference the allegations set forth in Paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69. As an employee of the Company, Topoll was Orbital's agent and owed the Company a fiduciary duty of loyalty.

70. After his resignation from Orbital, Topoll remained subject to a fiduciary duty to refrain from interfering with the Company's ability to accomplish the purpose of the agency, including Orbital's continued work for NIPSCO on the Valparaiso Viper Project.

71. Pursuant to his fiduciary duty, Topoll was prohibited from completing a transaction with NIPSCO on behalf of himself or DVG which he negotiated or was responsible for during his employment with Orbital, including the Valparaiso Viper Project.

72. Topoll interfered with the purpose of the agency by soliciting and diverting the Valparaiso Viper Project on behalf of DVG.

73. Topoll's actions constitute a breach of his fiduciary duty to Orbital.

74. Topoll reached an agreement with DVG to do the aforementioned unlawful and wrongful acts and to accomplish their unlawful purpose in diverting the Valparaiso Viper Project to DVG.

75. Defendants each took affirmative, concerted action in furtherance of their conspiracy to interfere with and divert the Valparaiso Viper Project from Orbital.

76. As a direct and proximate result of Defendants' aforementioned conduct, Orbital has been damaged and continues to sustain damages.

## COUNT II
**Tortious Interference with Business Relations**
**(Orbital v. Topoll)**

77. Orbital hereby incorporates by reference the allegations set forth in Paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78. Orbital has an ongoing business relationship with NIPSCO and has a valid business expectancy that this relationship will continue.

79. At all relevant times, Topoll was and continues to be aware of Orbital's ongoing business relationship with NIPSCO.

80. Topoll has interfered with, and is continuing to interfere with, Orbital's ongoing business relationship with NIPSCO, as demonstrated by his actions with respect to the Valparaiso Viper Project.

81. Topoll's actions are illegal and wrongful.

82. Orbital's conduct is not privileged or justified.

83. As a direct and proximate result of Topoll's aforementioned conduct, Orbital has been damaged and continues to sustain damages.

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty
### (Orbital v. DVG)

84. Orbital hereby incorporates by reference the allegations set forth in Paragraphs 1 through 83 of this Complaint as if fully set forth herein.

85. As set forth above, Topoll has breached his fiduciary duty to Orbital by diverting the Valparaiso Viper Project to DVG.

86. DVG knew of the aforementioned breach by Topoll of his fiduciary duty and actively participated in and assisted Topoll in those actions.

87. DVG provided substantial assistance and encouragement to Topoll in connection with the breach of his fiduciary duty.

88. DVG was aware of its role with respect to Topoll's breach of fiduciary when it provided assistance to Topoll.

89. As a direct and proximate result of Defendants' aforementioned conduct, Orbital has been damaged and continues to sustain damages.

**COUNT IV**
Trade Secret Misappropriation
Federal Defend Trade Secrets Act
(Orbital v. All Defendants)

90. Orbital hereby incorporates by reference the allegations set forth in Paragraphs 1 through 89 of this Complaint as if fully set forth herein.

91. Orbital has customers and employees in numerous states and its services are used in interstate commerce.

92. Orbital has developed and utilizes a broad range of proprietary and trade secret information in connection with its business activities as set forth above.

93. The information at issue derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

94. Orbital uses efforts that are reasonable under the circumstances to maintain the secrecy of that information.

95. Topoll acquired Orbital's trade secrets under circumstances giving rise to a duty to maintain their secrecy and to limit their use. Topoll has since used and/or disclosed those trade secrets to DVG.

96. Defendants have used Orbital's trade secrets for an improper purpose.

97. Defendants knowingly misappropriated, used, and disclosed the trade secrets for their own benefit.

98. Orbital has not consented, expressly or by implication, to Defendants' possession or misuse of Orbital's trade secrets.

99. Defendants' conduct is outrageous, egregious, malicious, and deliberate.

100. Defendants have been unjustly enriched by their misappropriation and use of Orbital's trade secrets.

101. As a direct and proximate result of Defendants' aforementioned conduct, Orbital has been damaged and continues to sustain damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Orbital Engineering, Inc., demands judgment in its favor and against Defendants, DVG Team, Inc. and Zachary Topoll, as follows:

a. Awarding Orbital monetary damages in excess of $75,000 according to proof at trial, plus interest, attorneys' fees, costs and expenses; and

b. Granting such other and further relief as the Court deems just and proper.

**A JURY TRIAL IS DEMANDED AS TO ALL COUNTS SO TRIABLE.**

Respectfully Submitted,

DENTONS COHEN & GRIGSBY P.C.

By: /s/ Fridrikh V. Shrayber
Fridrikh V. Shrayber
625 Liberty Avenue, 5th Floor
Pittsburgh, PA  15222-3152
Ph: (412) 297-4900 / Fax: (412) 209-1975
fred.shrayber@dentons.com

*Counsel for Plaintiff,*
*Orbital Engineering, Inc.*

Dated:  July 12, 2022

4077404