UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ORBITAL ENGINEERING, INC., ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:22-CV-185-JPK |
| ) | |
| DVG TEAM, INC. and ZACHARY TOPOLL, ) | |
| Defendants. ) | |

## OPINION AND ORDER

This matter is before the Court on motions to dismiss filed by Defendants DVG Team, Inc. ("DVG") [DE 8] and Zachary Topoll [DE 10]. Plaintiff Orbital Engineering, Inc. ("Orbital") pleads several state-law claims and a claim under the federal Defend Trade Secrets Act, alleging that Topoll, its former employee, illegally brought Orbital's confidential information to DVG, a competitor firm. Defendants seek to dismiss the complaint in its entirety.

The parties consented to have the case assigned to a United States Magistrate Judge for all further proceedings. [DE 15]. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 636(c) to decide the motions. For the reasons discussed below, the Court denies Topoll's motion. DVG's motion is granted as to Count I and Count III, but denied as to Count IV.

## FACTUAL BACKGROUND

On a motion to dismiss, the Court considers the facts in the light most favorable to the non-movant, Orbital, accepting all well-pleaded facts and drawing all plausible inferences in Orbital's favor. *See Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 862 (7th Cir. 2016).

The complaint alleges as follows: Orbital is a company that provides engineering, design, and construction services for public utilities, among other industries. [Compl. ¶ 13]. One of Orbital's largest customers is the Northern Indiana Public Service Company ("NIPSCO").

Orbital designs and provides NIPSCO with recloser devices[1], known as Vipers. [*Id.* ¶¶ 2, 26-28]. Defendant Zachary Topoll was the manager responsible for every aspect of Orbital's work for NIPSCO. In December 2021, Topoll was organizing a project to install 60 Vipers for NIPSCO in and around Valparaiso, Indiana, during 2022 and 2023. This was a continuation of Orbital's work for NIPSCO in previous years. [*Id.* ¶¶ 39, 44].

In his role, Topoll had access to a variety of information that Orbital considers to be confidential and/or trade secrets, including pricing models and methods, techniques for cost estimates, billing rates, and proprietary software. Orbital's employee handbook "require[d] Topoll to safeguard [Orbital's] confidential information during and after his employment." [*Id.* ¶¶ 35, 38].

Unknown to Orbital, Topoll was being recruited by DVG, a rival firm that wanted to compete with Orbital for its NIPSCO work. Topoll "knew everything about Orbital's work for NIPSCO, and he knew how to replicate those services, start-to-finish, on behalf of a competitor." On April 18, 2022, Topoll announced that he was resigning from his position at Orbital. Despite "pointed questions from [Orbital's] leadership," he did not tell Orbital that he intended to join a competitor. [*Id.* ¶¶ 42-43]. Orbital's management asked Topoll to help transition his responsibilities and train his replacement, and he agreed. In that role, Topoll continued to work on the Valparaiso Viper project until his employment ended on April 29, 2022. He retained access to Orbital's confidential information until his last day of employment, although Orbital would not have permitted that if it had known he was going to join a competitor. [*Id.* ¶¶ 49-50].

---

[1] "Reclosers operate essentially as high-voltage circuit breakers, responding automatically to surges or other electrical problems by shutting off the electricity." *Orlosky Inc. v. U.S.*, 68 Fed. Cl. 296, 299 (2005).

Several weeks after his resignation, Orbital learned that Topoll had accepted a position with DVG. Topoll accepted DVG's offer while he was still employed by Orbital, knowing that he would eventually pursue the Valparaiso Viper project on DVG's behalf. [*Id*. ¶¶ 55-56].

Before hiring Topoll, DVG did not market itself as providing the kind of "utility engineering" services that Orbital offered to NIPSCO, and did not have the expertise to provide those services. But after hiring Topoll, DVG "targeted" the Valparaiso Viper project using the confidential information that Topoll learned during his employment with Orbital. Topoll knew about Orbital's pricing and cost structures, as well as the resources needed to complete the work, and Topoll and DVG "exploited that information to present a proposal intended to undercut Orbital" by offering to complete the work more quickly. Ultimately, NIPSCO awarded DVG 40 percent of its work from the Valparaiso Viper project, "jump-start[ing] a practice that would have taken [DVG] a significant investment of time and resources to develop." [*Id*. ¶¶ 58-65].

Orbital alleges it sustained thousands of dollars in damages from the work it lost to DVG. Orbital brings claims for breach of fiduciary duty against both defendants (Count I); tortious interference with business relations against Topoll (Count II); aiding and abetting breach of fiduciary duty against DVG (Count III); and trade secret misappropriation, under the Defend Trade Secrets Act, against both defendants (Count IV). Defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6).

## **LEGAL STANDARD**

Dismissal under Rule 12(b)(6) is required if the complaint fails to describe a claim that is plausible on its face. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). While a complaint does not need detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

3

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The Seventh Circuit has described the standard for dismissal under Rule 12(b)(6) as follows:

> First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## DISCUSSION

Because the parties' arguments overlap as to certain counts, the Court considers the counts in order, rather than separately addressing each defendant's motion.

### A. Count I (Breach of Fiduciary Duty; Both defendants)

Orbital brings a claim of breach of fiduciary duty under Indiana law. Generally, to prevail on a breach of fiduciary duty claim, a plaintiff must prove the existence of a fiduciary duty, a breach of the duty, and harm to the plaintiff caused by the breach. *Franciscan All., Inc. v. Padgett*, 180 N.E.3d 944, 951-52 (Ind. Ct. App. 2021). The parties agree that Topoll[2] owed Orbital a fiduciary duty of loyalty during his employment. *See Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007). In general terms, this duty precludes the employee from "engaging in conduct dealing with the subject matter of the agency for his own benefit or in derogation of the interests of his [employer]." *Prudential Ins. Co. of Am. v. Crouch*,

---

[2] As explained below, Orbital imputes Topoll's alleged breaches to DVG, stating that both defendants "reached an agreement [] to do the aforementioned unlawful and wrongful acts." [Compl. ¶ 74].

4

606 F. Supp. 464, 471 (S.D. Ind. 1985), aff'd, 796 F.2d 477 (7th Cir. 1986). The duty becomes more complicated when an employee leaves, or plans to leave, for a competitor:

> Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer. An employee may make arrangements to compete with his employer, such as investments or the purchase of a rival corporation or equipment. However, the employee cannot properly use confidential information specific to his employer's business before the employee leaves his employ. These rules balance the concern for the integrity of the employment relationship against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty.

*SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 768 (Ind. Ct. App. 2011) (citing *Kopka, Landau & Pinkus*, 874 N.E.2d at 1070-71) (citations omitted)); *see also Burns-Kish Funeral Homes, Inc. v. Kish Funeral Homes, LLC*, 889 N.E.2d 15, 23-24 (Ind. Ct. App. 2008) ("As an employee, Kevin was not precluded from using information, knowledge, or skills gained during his employment with Burns–Kish and was allowed to make arrangements to compete before leaving Burns–Kish.").

While the parties do not address this, case law suggests[3] that a breach of fiduciary duty claim cannot center on an allegation that the employee misappropriated trade secrets or confidential information, because that claim would be preempted by the Indiana Uniform Trade Secrets Act ("IUTSA"). *See HDNet LLC v. N. Am. Boxing Council*, 972 N.E.2d 920, 924 (Ind. Ct. App. 2012); Ind. Code § 24-2-3. IUTSA "displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, except contract law and criminal law." § 24-2-3-1(c). The statute "abolishes all free-standing alternative causes of action for theft or misuse of

---

[3] The case most directly addressing preemption, *HDNet LLC*, dealt with a standalone claim for misappropriation of trade secrets, rather than a claim for breach of fiduciary duty, and it could be argued that a breach of fiduciary duty claim is not similarly preempted even though the allegations center on trade secret misappropriation. Because the parties do not address the issue, and it does not decide the motion, the Court does not attempt to resolve the question at this stage.

5

confidential, proprietary, or otherwise secret information falling short of trade secret status (*e.g.* idea misappropriation, information piracy, theft or commercial information)." *HDNet LLC*, 972 N.E.2d 920, 924 (Ind. Ct. App. 2012) (quotation omitted); *see Hartford Steam Boiler Inspection & Ins. Co. v. Campbell*, No. 420CV00117SEBDML, 2021 WL 1225951, at *10 (S.D. Ind. Mar. 31, 2021) ("To the extent that HSB is alleging that the Individual Defendants breached their fiduciary duties of loyalty by misappropriating trade secrets, that claim is obviously preempted by the IUTSA."). Assuming the preemption issue applies here, Orbital would have to state a "plausible non-preempted theory of a fiduciary duty breach." *Chroma Cars, LLC v. Harris*, No. 3:21-CV-825 DRL-MGG, 2022 WL 1686530, at *5 (N.D. Ind. May 25, 2022); *see also Inst. for Int'l Educ. of Students v. Qian Chen*, 380 F. Supp. 3d 801, 810 (S.D. Ind. 2019) ("Because misappropriation of trade secrets (or other information) is not the gravamen of Plaintiff's unfair competition claim, but merely part of the various underlying factual allegations, Plaintiff's unfair competition claim is not preempted by the IUTSA.").

Orbital pleads Count I against both defendants[4]. For the reasons below, the claim will be dismissed against DVG, but will proceed against Topoll.

### 1. Breach

Orbital plausibly alleges that when Topoll decided to leave Orbital sometime before April 18, 2022, he knew he would join DVG and try to attract some of Orbital's work to DVG. Defendants' motions to dismiss are premised on the idea that Orbital's claims wrongly impose a duty of loyalty on a former employee. Topoll characterizes the complaint as "focus[ing] . . . on

---

[4] The Court reads Count I to allege both a conspiracy and a stand-alone claim that Topoll breached his fiduciary duty. This is consistent with the arguments advanced by the parties. [*See* DE 10 at 1 (labeling Count I Breach of Fiduciary Duty); DE 11 at 19 ("In Count I, the Complaint alleges Topoll breached a fiduciary duty of loyalty. . ."); DE 17 at 8 (laying out elements of fiduciary duty claim)].

the mistaken claim that Topoll owed a continuing duty of loyalty upon termination of the employment relationship." [DE 11 at 6]. DVG goes so far as to say: "Orbital does not allege that Topoll committed any improper or 'disloyal' acts while he was employed by Orbital." [DE 9 at 13]. While the complaint alleges many facts regarding Topoll's post-employment activities, it also squarely alleges facts giving rise to a reasonable inference that Topoll breached his duty of loyalty during his employment. Simply put, it contains the very accusation DVG claims is lacking: disloyalty while Topoll was employed by Orbital. Orbital alleges that despite pointed questioning from Orbital, Topoll did not disclose that he was leaving for a competitor. [Compl. ¶ 43]. That allowed Topoll to retain access to information about the Viper project when Orbital otherwise would have cut off that access. Because the alleged breach during employment is properly pled, any theory of a "continuing" duty of loyalty after the employment is beyond the scope of the motion. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissal of parts of claims.").

An employee has a duty of honesty to their employer.[5] *See*, *e.g.*, *McHugh v. Rev. Bd. of Indiana Dep't of Workforce Dev.*, 842 N.E.2d 436, 442 (Ind. Ct. App. 2006) ("McHugh owed Employer the duty of basic honesty and truthfulness"); *Potts v. Rev. Bd. of Indiana Emp. Sec. Div.*, 475 N.E.2d 708, 711 (Ind. Ct. App. 1985) (an employee is "required to honestly and in

---

[5] Orbital argues that employees have a general "duty to speak" on any issues material to the employment. [DE 17 at 9]. Although Orbital has stated a claim for breach of fiduciary duty, the Court construes the duty more narrowly than Orbital does, at least for purposes of the instant motions. *See*, *e.g.*, *Kopka, Landau & Pinkus*, 874 N.E.2d at 1071-72 (attorney asking colleagues about their salary demands, intending to offer them employment after he joined another firm, did not breach fiduciary duty); *Economation, Inc. v. Automated Conveyor Sys., Inc.*, 694 F. Supp. 553, 557 (S.D. Ind. 1988) ("Although the [employee's duty] is subject to broad interpretation, the principle . . . has been narrowly applied. The duty of an employee to a former employer has been balanced against the right of the former agent to compete with his former principal. Case law . . . has developed restrictions and limitations inherent in the statement of the duty, seemingly intended to ensure an open and competitive marketplace."); *Crouch*, 606 F. Supp. at 471 ("The duty of an employee to a former employer must be considered alongside the common-law right of an employee to compete against his former employer . . . [The employee's duty] does not abrogate the right to compete, even 'steal' clients following termination of employment.") (citations omitted).

good faith . . . carry out the work to the best interest of the employer") (quoting *H.C. Bay Co. v. Kroner*, 149 N.E. 184, 185 (Ind. Ct. App. 1925)); *United States v. Bush*, 522 F.2d 641, 652 (7th Cir. 1975) (describing an employee's "duty not to conceal facts . . . material to the employer's conduct of its business and affairs"). Orbital alleges that "despite pointed questions" from its leadership, Topoll did not reveal his intention to join a competitor. [Compl. ¶ 43]. Orbital does not squarely allege that it asked Topoll whether he would join a competitor, nor that Topoll said he would not join a competitor. But at the pleading stage, this allegation raises a plausible inference that Topoll was dishonest in how he presented the circumstances of his departure. Orbital did not want its relationship with NIPSCO to be managed by someone who was about to join a competitor. *See Potts*, 475 N.E.2d at 713 (finding that employee's termination for cause was justified: "Once Potts made known his investment in a rival concern and his intention to leave[,] his employer may reasonably believe that Potts' devotion to [his job] would diminish . . . If Potts planned to work for the other company, his loyalty did not lie with [his employer]."). As Orbital tells it, Topoll effectively prevented Orbital from making that choice, breaching his duty to Orbital by "act[ing] to undermin[e Orbital's] business." *Ankersen v. Option Care Enterprises, Inc.*, No. 1:06CV905RLY-TAB, 2008 WL 151829, at *7 (S.D. Ind. Jan. 16, 2008).

Accordingly, the Court finds that Orbital has plausibly alleged a breach of duty by Topoll. The claim is not preempted by IUTSA under any standard, because Orbital has plausibly pled a breach of Topoll's fiduciary duty of honesty regardless of any trade secret misappropriation. *See Chroma Cars*, 2022 WL 1686530 at *5-6.

### 2. Causation

The complaint also supports an inference that the breach harmed Orbital. Orbital alleges that Topoll "divert[ed] to DVG a project that Topoll had secured and was responsible for

8

managing on Orbital's behalf." [DE 16 at 11; *see* Compl. ¶ 70]. There is no *per se* rule against a former employee winning work from his old employer. *See Crouch*, 606 F. Supp. at 471-72; *Economation, Inc. v. Automated Conveyor Sys., Inc.*, 694 F. Supp. 553, 559 (S.D. Ind. 1988) ("Where [] the contracts have not reached the point of completion, the desire to maintain an open and competitive marketplace prevails and the employee is not foreclosed from pursuing the sale [for another employer]."). But the complaint contains some allegations supporting a plausible inference that Topoll's breach caused Orbital to lose the NIPSCO work.

The Court notes that at this stage of the case, Orbital is likely not well-positioned to make precise allegations about the details of DVG's recruitment of Topoll, what information Topoll shared with DVG, or how exactly that informed DVG's proposal to NIPSCO. *See*, *e.g.*, *Cunningham v. Foresters Fin. Servs., Inc.*, 300 F. Supp. 3d 1004, 1016 (N.D. Ind. 2018) ("The Complaint does not allege details regarding the relationships [among the] defendants, but Plaintiff cannot reasonably be expected to know such information at this stage of litigation."); *Campbell v. Cowen*, No. 3:11-CV-74, 2012 WL 1636996, at *2 (N.D. Ind. May 9, 2012); *U.S. ex rel. Howard v. Urb. Inv. Tr., Inc.*, No. 03 C 7668, 2010 WL 148643, at *4 (N.D. Ill. Jan. 14, 2010) ("At the complaint stage, plaintiffs are not expected to know or allege the complete details of each defendant's precise role . . . [t]he discovery process is used to determine the exact particulars.").

Perhaps for that reason, Orbital does not attempt to allege when DVG began recruiting Topoll, or when Topoll accepted DVG's offer. Topoll announced his resignation on April 18, 2022, and it is reasonable to infer that the recruitment started before then. The complaint in fact supports an inference that the recruitment began well before that date, because it allegedly takes "a significant investment of time and resources" to develop a utility engineering practice like

Orbital's. [Compl. ¶ 62]. Orbital describes the run-up to Topoll's departure on April 29, 2022 as follows:

> 48.  On April 13, 2022 – mere days before announcing his resignation – Topoll informed NIPSCO that he had completed a draft proposed change order for the Valparaiso Viper Project but was awaiting confirmation concerning the exact locations of the Vipers.
>
> 49.  After Topoll announced his intention to resign, Orbital's leadership asked Topoll to help transition his responsibilities to and [sic] train his replacement at [Orbital] so as to ensure that NIPSCO did not experience any interruptions or delays resulting from Topoll's resignation. Topoll agreed, and Orbital continued to involve and copy Topoll on confidential internal communications concerning Valparaiso Viper Project as well as other work for NIPSCO.
>
> 50.  Had Topoll disclosed his intention to join a competitor, Orbital would have immediately shut off his access to [Orbital's] internal information and terminated his involvement with NIPSCO-related work.
>
> 51.  On or about April 28, 2022 (i.e., Topoll's penultimate day with Orbital), NIPSCO sent to Orbital the locations for the Vipers to be installed under the Valparaiso Viper project. Topoll was copied on that communication.
>
> 52.  On April 29, 2022 (i.e., Topoll's last day with Orbital), NIPSCO provided an estimated timeline for Orbital to complete its work under the Valparaiso Viper Project. Topoll was copied on that communication was well.
>
> 53.  When Topoll left Orbital on April 29, 2022, he knew exactly what services Orbital would be providing to NIPSCO under the Valparaiso Viper Project (among others), where those services would be provided, and when.

Orbital alleges that Topoll and DVG capitalized on this information by offering to "complete a portion of the work on an expedited basis," a proposal which was deliberately "intended to undercut Orbital." [¶ 63]. Far more detail will be required at a later stage of the case, given the law permitting a departing employee to compete with his employer. It may well be that the only recoverable damages are the salary Orbital paid to Topoll after he decided to leave. *See SJS Refractory Co.*, 952 N.E.2d at 768 ("The remedy for the breach of a fiduciary duty is requiring the agent to disgorge all compensation received during the period of employment in

10

which the agent was also breaching his fiduciary duty."). But at the pleading stage, it is plausible to infer that Topoll misled Orbital so he could continue to access information about the Viper project, and used that information on behalf of DVG to compete for the very business he worked on during his final days at Orbital. Those allegations, backed by the certification under Federal Rule of Civil Procedure 11 that they have or are likely to have evidentiary support, are sufficient to proceed against Topoll. *Wordlaw v. Enter. Leasing Co. of Chicago*, *LLC*, No. 20 CV 3200, 2020 WL 7490414, at *3 (N.D. Ill. Dec. 21, 2020); *see* Fed. R. Civ. P. 11(b)(2).

### 3. DVG

Orbital also pleads this claim against DVG, alleging that DVG conspired in Topoll's breach. However, Orbital has not pled facts showing that DVG agreed, or even knew, that Topoll would breach a duty to Orbital. Orbital's allegations about DVG's involvement mostly describe actions taken by DVG after Topoll's employment with Orbital had ended. [*See, e.g.,*, Compl. ¶¶ 60-62 ("After DVG hired Topoll, Defendants targeted the Valparaiso Viper Project…")]. And the specific allegations about DVG's actions *during* Topoll's employment with Orbital appear consistent with DVG simply attempting to poach an experienced employee from a competing firm. [*See id*. ¶ 57 ("DVG knew the nature of Topoll's role and responsibilities for Orbital [and] sought to hire Topoll to compete with Orbital")]. The Court recognizes that Orbital's understanding of DVG's role may expand through discovery, and the parties will be allowed to seek leave to amend the pleadings if needed. But at this stage, the complaint does not support a plausible inference that DVG conspired with Topoll to breach his duty to Orbital.

### B. Count II (Tortious Interference with Business Relations) (Topoll only)

Next, Orbital pleads a claim for tortious interference with business relations against Topoll, based on his interference with Orbital's relationship with NIPSCO. The elements of the

11

tort are: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship via illegal conduct; (4) the absence of justification; and (5) damages resulting from the wrongful interference. *Miller v. Cent. Indiana Cmty. Found.*, Inc., 11 N.E.3d 944, 961 (Ind. Ct. App. 2014) (citations omitted).

Topoll does not dispute the first two elements: the existence of the relationship between Orbital and NIPSCO, or the fact that he was aware of it. Topoll does dispute whether the allegations against him support an inference of "illegal" conduct. But Topoll's argument is based on his own assertion that he merely "utiliz[ed] information obtained as an employee to further the interests of a competitor." [DE 11 at 9]. For the reasons previously described, Orbital has plausibly alleged that Topoll breached his fiduciary duty, and courts have held that this satisfies the third element at the motion-to-dismiss stage.[6] *See Chen*, 380 F. Supp. 3d at 808; *CDW LLC v. NETech Corp.*, No. 1:10-CV-0530-SEB-DML, 2011 WL 3844160, at *5 (S.D. Ind. Aug. 26, 2011); *Meridian Fin. Advisors Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1064 (S.D. Ind. 2011) ("[s]ufficiently 'wrongful' conduct, such as a breach of fiduciary duty, can satisfy the requirement of independent illegal action").

Topoll argues that the claim cannot proceed because its actions were justified, negating the fourth element of the tort. Indiana courts have applied two different tests to assess justification. *See Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 215 (Ind. 2019) (discussing both approaches without resolving which test is appropriate). Under one test, courts consider the defendant's conduct, motive, and interests; the plaintiff's interests;

---

[6] The exact boundaries of this element may be contested at a later stage, because "Indiana courts have not provided significant guidance regarding what actions are sufficiently 'illegal'." *CDW LLC*, 2011 WL 3844160, at *5.

society's interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; the proximity of the defendant's conduct to the interference; and the relationship between the parties. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994). Under another test, which appears to be stricter on the plaintiff, an action is unjustified only if done "intentionally and without a legitimate business purpose and [the] breach is malicious and exclusively directed to the injury and damage of another." *Am. Consulting, Inc.*, 136 N.E.3d at 215 (citing *Morgan Asset Holding Corp. v. CoBank*, ACB, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000)).

The Court does not foreclose the possibility that the breach of fiduciary duty alleged here could be "justified" for purposes of the tort. But Orbital has plausibly alleged that Topoll joined DVG with the goal of intentionally securing Orbital's work, by breaching his duty of honesty to Orbital and potentially misappropriating its trade secrets. Those allegations would appear to satisfy even the stricter test requiring a "malicious" breach exclusively directed at Orbital.

### C. Count III (Aiding and Abetting Breach) (DVG only)

In Count III, Orbital pleads a claim against DVG for aiding and abetting Topoll's breach of duty. The parties dispute whether Indiana law recognizes such a claim. "Where state law provides the rule of decision, the federal courts must predict how the highest court of the state would decide the case if presented with the case today." *Klunk v. Cnty. of St. Joseph*, 170 F.3d 772, 777 (7th Cir. 1999). When the state's highest court has not resolved the issue, the federal court looks to the decisions of the intermediate courts. *See Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 811-12 (7th Cir. 2018).

The Indiana Supreme Court has not squarely addressed this issue. The clearest statement was made by the Indiana Court of Appeals in *Crystal Valley Sales, Inc. v. Anderson*, 22 N.E.3d

13

646, 656 (Ind. Ct. App. 2014): "To the extent that the allegation . . . resembles a claim of aiding and abetting a fiduciary in the breach of a fiduciary duty, we note that Indiana does not recognize such a cause of action." (citing *DiMaggio v. Rosario*, 950 N.E.2d 1272, 1274 (Ind. Ct. App. 2011)). Orbital cites to federal court cases predicting that Indiana courts would or could recognize the tort, including two recent cases in which motions for summary judgment were denied on that basis. [*See* DE 16 at 14-15, DE 16-1, DE 16-2]. Considering the intermediate court's clear statement in *Crystal Valley Sales*, the Court predicts that the Indiana Supreme Court would not recognize the claim. *See Pratt Logistics, LLC v. United Transp., Inc.*, No. 2:21-CV-148-PPS-APR, 2021 WL 4335143, at *7 (N.D. Ind. Sept. 22, 2021). Regardless, the claim would suffer from similar flaws as the conspiracy claim against DVG; the complaint does not support a plausible inference that DVG intended or agreed for Topoll to breach his duty of loyalty to Orbital. *See* § A.3, *supra.*

### D.  Count IV (Trade Secret Misappropriation) (Both defendants)

Finally, Orbital pleads a claim of trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA"). This claim is not subject to preemption by the IUTSA. *See* Ind. Code § 24-2-3-1(c) (IUTSA "displaces all conflicting law *of this state* pertaining to the misappropriation of trade secrets, except contract law and criminal law" (emphasis added); *Hartford Steam Boiler Inspection & Ins. Co. v. Campbell*, No. 420CV00117SEBDML, 2021 WL 1225951 (S.D. Ind. Mar. 31, 2021).

DTSA authorizes "[a]n owner of a trade secret that is misappropriated" to bring a civil action under the statute. 18 U.S.C. § 1836(b). A trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible" if the owner "has taken reasonable measures to keep such information

14

secret" and "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person." 18 U.S.C. § 1839. Misappropriation is "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Magnesita Refractories Co. v. Mishra*, No. 2:16-CV-524-PPS-JEM, 2018 WL 6435648, at *12 (N.D. Ind. Dec. 7, 2018) (quoting *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016)); *see* 18 U.S.C. § 1839(5)(A)-(B).

   1. **Trade Secret**

Defendants argue that Orbital has not alleged a trade secret because it has not defined the secret with enough specificity. Orbital described some of the information as follows:

- Orbital's models and methodology used in calculating project pricing and costs, including the various inputs that make up that calculation;

- Orbital's information and tools utilized to help develop cost estimation for project tasks specifically for electric utility distribution and transmission design and construction;

- Orbital's information and methodology used in preparing joint use per pole pricing calculations, including time studies and budget monitoring;

- Orbital's agreed billing rates by role, which Orbital negotiated with NIPSCO;

- Orbital's automation software, which was created to develop, test and launch technology driven solutions to automate project deliverables for NIPSCO.

[Compl. ¶ 38]. Defendants argue that Orbital's list "does not provide sufficient detail to identify any particular trade secret." [*See* DE 9 at 10, citing *LigTel Commc'ns, Inc. v. Baicells Techs., Inc.*, 455 F. Supp. 3d 792, 807 (N.D. Ind. 2020) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition[.]")].

But the statute itself does not mandate any degree of specificity; it requires Orbital to show that it derives economic value from the information not being generally known or ascertainable. *See* 18 U.S.C. § 1839. The complaint supports a plausible inference that Topoll and DVG, being aware of (for example) Orbital's internal budgeting, used that information to fashion a more competitive offer for the NIPSCO work, and secured work that in previous years had been awarded to Orbital when that information was secret.[7] Defendants criticize Orbital for listing "broad categories" of information as trade secrets, but Orbital has pled facts supporting a plausible inference that it gained economic value from other entities not knowing the information. *See Chroma Cars*, 2022 WL 1686530 at *4 ("As alleged, Ms. Harris disclosed trade secrets, including the Max Allowance IP user base, size, and revenue . . . [Plaintiff] need only plead facts, taken as true, that plausibly show actual or threatened misappropriation of the Max Allowance IP. They needn't be any more detailed than they are."); *Genesys Telecommunications Lab'ys, Inc. v. Morales*, No. 119CV00695TWPDML, 2019 WL 5722225, at *12-13 (S.D. Ind. Nov. 5, 2019); *see also Romary Assocs., Inc. v. Kibbi* LLC, 2011 WL 13254419, at *13 (N.D. Ind. June 17, 2011) ("Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation.") (citations omitted).

---

[7] At the motion-to-dismiss stage, the Court does not adopt Topoll's inference that "the real value asset in maintaining a strong relationship with NIPSCO was not the [alleged] trade secrets . . . but rather the experience and skill of Topoll himself." [DE 11 at 12].

16

DVG also argues that the information was not a trade secret because Orbital failed to take reasonable measures to safeguard it. However, Orbital alleges that its employee handbook forbade "the disclosure and misuse" of the information; that Topoll understood and agreed with that requirement as a condition of his employment; and that the information was given to employees on a "need-to-know" basis and protected with employee-specific passwords. [Compl. ¶ 23]. DVG notes that Orbital did not seek to impose a non-disclosure agreement or other restrictive covenant on Topoll. [DE 9 at 10]. But there is no *per se* requirement that trade secrets be protected with non-disclosure agreements. At best, DVG raises a factual question to be resolved at a later stage of the case. *See Aircraft Gear Corp. v. Lentsch*, No. 18 C 50244, 2023 WL 2368038, at *8 (N.D. Ill. Mar. 6, 2023) ("Whether a lack of written confidentiality agreements . . . means plaintiff did not take 'reasonable measures to keep such information secret' is a question for the jury."); *Sonrai Sys., LLC v. Waste Connections, Inc.*, No. 21-CV-02575, 2023 WL 2266147, at *7 (N.D. Ill. Feb. 28, 2023) ("Without clear controlling precedent requiring written confidentiality agreements in each and every case, this Court will not impose such a requirement at [the pleading] stage."); *Symbria, Inc. v. Callen*, No. 20-cv-4084, 2022 WL 60530, at *11 (N.D. Ill. Jan. 6, 2022) ("[T]he law does not require Plaintiffs to guard their trade secrets by mandating confidentiality agreements with each employee; Plaintiffs can maintain secrecy by, among other things, physically securing its facilities and limiting access to its secrets to employees on a need-to-know basis.").

2. **Misappropriation**

Finally, both defendants argue that Orbital cannot state a claim under DTSA because it has not alleged that they misappropriated the information. As explained above, misappropriation can arise from the acquisition, disclosure, or use of a trade secret. A claim based on acquisition

17

arises when the defendant acquired the secret by "improper means," or had reason to know that the means of acquisition were improper. As relevant here, a claim based on disclosure or use arises when the disclosure or use was not consented to, and:

> (1) at the time of disclosure or use, the defendant knew or had reason to know that the trade secret came from a person who had acquired it through improper means, *or*
>
> (2) at the time of disclosure or use, the defendant knew or had reason to know that the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of the secret.

18 U.S.C. § 1839(5)(B). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage." § 1839(6)(A).

It does not appear that Orbital has stated a DTSA claim against any defendant based on acquisition of the alleged trade secrets, and Orbital does not argue so.[8] *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) ("The complaint itself makes plain that rather than acquiring the alleged trade secrets by improper means, Croner acquired them through the normal course of his employment."). However, Orbital has stated a claim against both defendants for the disclosure and use of the alleged trade secrets. There were at least two occasions when the information was "disclosed" or "used" without Orbital's consent: first, when Topoll shared the information with DVG[9]; and later, when DVG (and presumably, Topoll)

---

[8] Orbital's briefing does not address whether the information Topoll received in the last weeks of his employment was obtained by "misrepresentation" in that he failed to disclose his imminent departure to DVG. Orbital's DTSA arguments focus on claims of authorized disclosure and use, rather than acquisition. [*See* DE 16 at 20-22, DE 17 at 19-21]. The Court does not attempt to resolve the question at this stage, because Orbital has sufficiently pled a DTSA claim on other grounds.

[9] Both defendants argue that DVG outbidding Orbital for the NIPSCO work does not necessarily imply that Topoll shared confidential information. [DE 9 at 12, DE 11 at 17]. That may be the subject of a factual dispute later in the case. But the complaint supports a plausible inference that Topoll shared confidential information with DVG that

presented a proposal to NIPSCO that was informed by the confidential information [*see* Compl. ¶¶ 61-63].

The complaint supports a plausible inference that at the time of Topoll's disclosure to DVG, Topoll "knew or had reason to know that the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of the secret." § 1839(5)(B)(ii)(III). Orbital alleges that its employee manual "require[d] Topoll to safeguard [Orbital's] confidential information during and after his employment," and that Topoll acknowledged and understood these obligations. [Compl. ¶¶ 34, 35]. It is reasonable to infer that the manual imposed a duty to maintain the secrecy or limit the use of the information that Topoll eventually shared with DVG.

Similarly, the complaint supports a plausible inference that when DVG presented its proposal to NIPSCO, DVG knew or had reason to know that it was informed by confidential material. As noted above, the complaint does not allege that DVG was actively looking for confidential information when it began recruiting Topoll. But once Topoll started work with DVG, and DVG was apprised of the information that Topoll brought with him, it is reasonable to infer that DVG would have reason to know of the secrecy of the information. Even if Topoll were the only individual who knew, his knowledge is imputed to DVG. *See BGC Ent., Inc. v. Buchanan ex rel. Buchanan*, 41 N.E.3d 692, 701-02 (Ind. Ct. App. 2015).

DVG argues that Orbital's claim is based on little more than the fact of Orbital losing business to DVG. [DE 9 at 12-13]. The Court agrees that trade secret misappropriation cannot be

---

helped DVG make a more competitive bid. Orbital alleges that Topoll and DVG promised to complete the work more quickly than Orbital could, based on Topoll's understanding of Orbital's resources and capabilities [Compl. ¶ 63]. Unlike in other cases with rejected misappropriation claims, there is more to this complaint than "former employees . . . offering the same services to the same clientele." *Indus. Packaging Supplies, Inc. v. Channell*, No. 18 CV 165, 2018 WL 2560993, at *2 (N.D. Ill. June 4, 2018).

inferred merely from one company winning business from another. But Orbital's allegations support a plausible inference that Defendants have "done more than legally compete in the normal course of business," *Croner*, 419 F. Supp. 3d at 1069, by using confidential information that they knew had been improperly obtained. Orbital has also explained not just that Topoll had access to the secrets, but why it believes the loss of business was tied to the secrets. *Cf. Indus. Packaging Supplies, Inc. v. Channell*, No. 18 CV 165, 2018 WL 2560993, at *2 (N.D. Ill. June 4, 2018) (fact that employees had access to trade secrets, then left for a competing firm, was "not enough to justify [] otherwise unsupported suspicions that the [employees] used or disclosed the information"). Although Defendants dispute Orbital's diagnosis of why it lost the NIPSCO work, that issue cannot be resolved on a motion to dismiss. Orbital has properly alleged a DTSA claim against both defendants.

## CONCLUSION

Based on the foregoing, the Court **GRANTS in part** DVG's Motion to Dismiss [DE 8], and **DENIES** Topoll's Motion to Dismiss [DE 10]:

- Count I is **DISMISSED** as to DVG, but remains pending as to Topoll;
- Count II remains pending;
- Count III is **DISMISSED**;
- Count IV remains pending as to both defendants.

A Rule 16 Preliminary Pretrial Conference will be set by separate order.

So ORDERED this 28th day of April, 2023.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT